ADOPTION OF THEA.[1]

No. 10-P-1671.

Essex. January 19, 2011. - February 25, 2011.

Present: KAFKER, COHEN, & RUBIN, JJ.

*Minor,* Care and protection, Adoption, Visitation rights. *Parent and Child,* Care and protection of minor, Dispensing with parent's consent to adoption. *Adoption,* Care and protection, Dispensing with parent's consent, Visitation rights. *Practice, Civil,* Care and protection proceeding. *Due Process of Law,* Care and protection of minor.

This court vacated a Juvenile Court judge's decree terminating the mother's parental rights and remanded the matter for further proceedings, where, although the evidence clearly and convincingly supported the judge's finding of the mother's current unfitness to care for the child [822-823], this court could not discern from the judge's findings whether there was an appropriate plan in place and whether termination was in the best interests of the child [823-825]; and where the judge did not expressly address the issue of post-termination visitation in his decision [825-826].

There was no merit to a mother's claim that, in a Juvenile Court proceeding to terminate her parental rights, her right to due process was violated by the child's testifying by telephone. [826]

PETITION filed in the Essex County Division of the Juvenile Court Department on November 16, 2006.

The case was heard by *Jose A. Sanchez,* J.

*Mary P. Luke* for the mother.

*Suleyken D. Walker,* Assistant Attorney General, for the Department of Children and Families.

*Ann V. Crowley* for the child.

KAFKER, J. The mother appeals from the decree terminating her parental rights to her deeply troubled seventeen year old daughter. The child, Thea, contends that the decree should be affirmed, but that the Juvenile Court judge erred in not ordering

[1]A pseudonym.

posttermination visitation. We conclude that the finding of parental unfitness was supported by clear and convincing evidence, but we are unable to determine on the record before us whether the termination of parental rights was in the best interests of Thea as the plan proposed for this high risk teenager by the Department of Children and Families (department)[2] was undeveloped. We also conclude that the judge should expressly address the issue of posttermination visitation. Accordingly, we remand for further proceedings, including a hearing to elicit additional evidence and findings.

*Background.* The following facts are summarized from the judge's findings. Thea was born in November, 1993. The mother and father's relationship was replete with domestic violence witnessed by Thea.[3] In January, 2001, the Missouri Children Protective Services received a report that the mother was neglecting Thea and her older brother.[4] Thea had been setting fires, had an excessive hand washing ritual, and would scratch herself until she bled. After being hospitalized for mental health issues, Thea was diagnosed with bipolar disorder with psychotic features and mixed attention deficit disorder, and enuresis. During her hospitalization, Thea revealed that her older brother had sexually assaulted her.

On May 21, 2002, after relocating from Missouri to Massachusetts, the mother and Thea came to the attention of the department when a G. L. c. 119, § 51A, report was filed by a mandated reporter. The report alleged that the mother was neglecting Thea, detailing that Thea was unkempt, hypervigilant, possessed poor social skills, cried easily, and was withdrawn. She was described as an "extremely fragile, needy girl."

The report was screened-in for a nonemergency response and a G. L. c. 119, § 51B, investigation was conducted. The investigation revealed a cluttered and unclean home. The mother and Thea lived with the mother's new husband[5] and his three adult brothers.

---

[2]Formerly the Department of Social Services.

[3]The father's rights have been terminated and are not an issue on appeal.

[4]The mother's parental rights as to the older brother were voluntarily terminated and he subsequently was adopted. The mother last had contact with him in 2001.

[5]At some unspecified time after moving to Massachusetts, the mother remarried.

Thea slept in the same room as the mother and her husband; there was no divider between the two sleeping areas, and Thea had a clear view of her mother's bed. Thea also found and kept the mother's sex toys which the mother had stored in a suit case in the room where Thea slept. Additionally, Thea would crawl into the beds of the adult brothers of her stepfather when she had nightmares.

After the investigation, the allegations of neglect were supported. The department attempted to work with the mother on improving the environment for Thea. Although the mother hung a privacy curtain in Thea's makeshift bedroom, attended individual counseling sessions, and, for a period of time, brought Thea to therapy, she "generally showed no interest in changing her living situation." In 2004, the department closed the mother's case, finding that she failed to cooperate with the department or engage its services.

On March 24, 2006, the family became reinvolved with the department when a G. L. c. 119, § 51A, report was filed by an anonymous reporter. The report alleged physical abuse and neglect by both the mother and the stepfather. Specifically, the report asserted that the mother and the stepfather physically and emotionally abused Thea, that one of the stepfather's brothers walked around the house dressed in women's underwear, that one of the toilets in the house was not functional, and that, in school, Thea was performing poorly and acting out sexually.

After the report was screened-in for a nonemergency response, the department conducted its second G. L. c. 119, § 51B, investigation of the family. The investigator described both the mother and the stepfather as unwashed and disheveled; Thea, also described as disheveled, was wearing oversized clothes and presented as younger than her twelve years of age. Further, the investigator found that the family house was dirty and in disrepair.[6] The social worker was also concerned about boundaries

---

[6]On April 4, 2006, the Department of Public Health received complaints regarding the home. An inspector observed that the bathroom toilet was not working, there was a hole in the wall of the tub unit, the kitchen floor tiles were missing, and a kitchen cabinet door was broken. Upon reinspection on April 12 and April 26, the holes had been fixed, the toilet was functional, and the hallway, living room, and Thea's new bedroom, which was now separate from the bedroom of her mother and stepfather, had been painted.

being crossed between Thea and the brothers of the stepfather. Thea was observed having to drape herself all over one of them and hug and kiss him in order to retrieve her backpack.

The investigation confirmed the allegations of neglect, but was unable to substantiate the allegations of physical abuse. Although the family made progress addressing Thea's living conditions, there were still concerns about Thea's behavior, particularly her tendency to hoard, lie, and engage in sexually provocative behavior at school. The mother was generally hostile to attempts by the department to help her address these behavioral issues.

On November 8, 2006, after the family failed to reconnect heat and hot water service prior to a department-imposed deadline, the department filed a care and protection petition on behalf of Thea. The judge found that the petition was also based on the mother's long history of neglect and safety concerns and lack of boundaries in the home.

After the mother repeatedly failed to comply with the department's service plans, in July, 2007, the goal was changed from reunification to long-term substitute care. Subsequently, the department filed a notice of intent seeking the termination of the mother's parental rights in September, 2007. In February, 2008, the mother waived her right to trial via a stipulation and permanent custody of Thea was granted to the department based on a finding of unfitness and Thea's need for care and protection.

The mother regularly visited Thea. She brought healthy snacks and crafts for Thea, and gifts for her birthday and holidays. The mother was, however, inappropriate during visits. She asked Thea questions about her attorney and matters related to the case. The mother also mocked Thea for not performing tasks quickly enough and engaged in overly competitive adolescent play. The mother would not listen to Thea at visits. She once went to punch Thea, and when Thea flinched, she said, "What did you think, I was going to hit you again."[7] She also drew pictures of Thea's breasts and took photographs of Thea in provocative poses. She also licked her face on one visit. In August, 2008, the department suspended the mother's visitation rights.[8] When the service plan was extended to January 27,

_____

[7]The judge found that the mother would hit Thea when angry.

[8]Although Thea would eventually request a visit from her mother, the

2010, Thea's clinicians recommended that it would be harmful for Thea to visit with the mother due to Thea's unsafe behavior.

Since the department took custody of Thea, her instability has only deepened, resulting in increasingly secure hospital placements. After Thea repeatedly fled treatment sites and engaged in dangerous behaviors, including cutting herself, running into traffic, drug abuse, and prostitution, she was moved to a locked, long-term hospitalization unit. Thea is currently placed in the long-term hospitalization unit in the transitions program at the Worcester State Hospital. The judge found that the department would transition her to a less secure facility if she demonstrated that she could keep herself safe, which she has so far been unable to do. She attempted to flee while on a community pass for the program.

Thea testified, and the judge found, that she does not want to live with her mother or allow her mother to have any control over her affairs, including her medical treatment,[9] or where she lives. The social worker found that Thea still loves her mother. The social worker also supported the mother and Thea maintaining a relationship as long as it could be a safe and healthy one, although she was not sure this was possible.

1. *Sufficiency of evidence of unfitness.* Before terminating parental rights, "a judge must find by clear and convincing evidence that a parent is currently unfit to further the child's [welfare and] best interest." *Adoption of Abby*, 62 Mass. App. Ct. 816, 823 (2005). See G. L. c. 210, § 3. "Generally, no one factor is determinative and the judge should weigh all the evidence." *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 399 Mass. 279, 290 (1987).

Here, the evidence clearly and convincingly supports the judge's finding of unfitness of the mother to care for Thea, especially in light of Thea's disturbed and unstable condition. Following a seven-day trial, the judge issued a forty-five page decision containing 171 detailed factual findings supporting the

---

mother failed to attend the scheduled visit. With the exception of a two-page letter, the mother has not contacted Thea since visitation rights were suspended in August, 2008.

[9]Thea receives five medications including Abilify, which requires court approval.

determination of parental unfitness.[10] Those factual findings have not been meaningfully challenged on appeal.

Pursuant to G. L. c. 210, § 3, the judge considered the fourteen factors indicating unfitness and concluded that at least six were applicable. Throughout Thea's life with her mother, the record establishes that the mother continually neglected Thea and housed her in a home environment that was unclean, inappropriate, and often without heat and hot water. G. L. c. 210, § 3(c)(ix). The record also shows that the mother repeatedly failed to comply with the majority of her service plan tasks which were specifically designed to remedy conditions that created a risk of harm to the deeply troubled teenager. G. L. c. 210, § 3(c)(viii).

In light of these thorough findings of fact, the department has proven by clear and convincing evidence that the mother is unfit to care for Thea.

2. *Sufficiency of evidence of best interests.* In determining whether to dispense with parental consent to adoption, the judge must not only determine whether a parent is unfit, but it must also evaluate "whether dispensing with the need for parental consent will be in the best interests of the child[ ]." *Adoption of Mary,* 414 Mass. 705, 710 (1993). This is a "two-part analysis." *Adoption of Nancy,* 443 Mass. 512, 515 (2005). See *Adoption of Ramona,* 61 Mass. App. Ct. 260, 265 (2004). "After ascertaining unfitness, the judge must determine whether the parent's unfitness is such that it would be in the child's best interests to end all legal relations between parent and child." *Adoption of Nancy, supra.*[11] This involves a consideration of not only "the parent's character, temperament, capacity and conduct in relation to the particular child's needs, age, affections and environment," *Adoption of Carlos,* 413 Mass. 339, 348 (1992), but also the permanency plan proposed by the department. *Adoption of Nancy, supra.* See *Adoption of Vito,* 431 Mass. 550, 568 n.28 (2000).

Unfortunately, the record and decision here contain important gaps. There are inadequate findings as to why termination at

---

[10]We note that the mother did not testify at trial.

[11]Accordingly, "even if a parent is found to be unfit, there are some situations in which the child's best interest may be served without a decree of termination." *Adoption of Flora,* 60 Mass. App. Ct. 334, 342 (2004).

this time is or is not in Thea's best interests. To begin with, there is almost nothing in the record or decision regarding the department's plan for Thea posttermination. Thea is in a long-term hospitalization unit. The judge found that the department would transition her to a less secure facility if she could keep herself safe, but further found that she has so far been unable to do so. Moreover, Thea turns eighteen in November, 2011. The consequences of the termination attendant on the fact that this high risk teenager will imminently turn eighteen are not addressed by the judge. As explained in a detailed postargument letter submitted by the department, there are a variety of different possible scenarios for Thea when she turns eighteen. Thea could decide to return home. Alternatively, with or without termination, if Thea so requested, she could continue to receive care from the department until the age of twenty-two. G. L. c. 119, § 23(f), as amended by St. 2010, c. 359, § 19. The department might also seek guardianship of the child through the procedures set forth in G. L. c. 190B, §§ 5-301 through 5-313, inserted by St. 2008, c. 529, § 9. Finally, even if Thea chose not to remain under the care and responsibility of the department after age eighteen, or if the department was not appointed as guardian, and again, regardless of whether the mother's rights are terminated, the department would nonetheless be required to provide a transition plan satisfactory to the court. G. L. c. 119, § 23(f). We do not, however, know from this record what the department's plans are for Thea as she approaches eighteen.

The Supreme Judicial Court has emphasized the importance of achieving stability and permanency in children's lives and in decrees dispensing with parental rights. *Adoption of Nancy*, 443 Mass. at 517. In the instant case, Thea's placement and plan appear to have neither stability nor permanency. Thea's current placement is unstable. Compare *Adoption of Nancy*, *supra* ("[h]ere we have a case where the children are finally in stable situations"). There also does not appear to be an identifiable plan in place for this extremely high risk teenager. *Adoption of Dora*, 52 Mass. App. Ct. 472, 475 (2001), quoting from *Adoption of Lars*, 46 Mass. App. Ct. 30, 31 (1998), *S.C.*, 431 Mass. 1106 (2000) ("judge must perform a 'careful evaluation of the suitability' of the plan and must 'meaningfully . . . evaluate'

what is proposed to be done for the child"). We also cannot discern whether the judge gave adequate consideration to the alternative of having the department retain custody without terminating parental rights. Consequently, without further evidence, fact-finding and analysis regarding the department's current and future plans for this terribly troubled teenager, we cannot discern whether there is an appropriate plan in place and whether termination of parental rights is in the best interests of this teenager.

We recognize that stability and permanence in a child's life may in some cases be "eased" by termination of parental rights "even when it is not a prerequisite for the implementation of the permanency plan." *Adoption of Nancy*, 443 Mass. at 517, 518. This may be the case here, given Thea's extremely high risk behavior and significant mental health problems, and the mother's unfitness and her adversary relationship with the department. But the judge's findings are insufficient to support such a conclusion, and, particularly given Thea's age, this issue requires further exploration in the context of an identifiable plan.

3. *Posttermination visitation.* The judge did not expressly address the issue of posttermination visitation in his decision. Should he decide, after remand, that termination of parental rights is in the best interests of the child, the issue of posttermination visitation should still be discussed. Cf. *Adoption of John*, 53 Mass. App. Ct. 431, 439-440 (2001) (ordering remand for further proceedings on postadoption visitation). Thea's counsel has expressly requested visitation for this seventeen year old child.[12] Although posttermination visitation is a discretionary decision of the trial judge, "[c]ases warranting a postadoption contact order are more likely to occur where no preadoptive family has yet been identified, and where a principal, if not the only, parent-child relationship in the child's life remains with the biological parent." *Adoption of Terrence*, 57 Mass. App. Ct. 832, 839 (2003), quoting from *Adoption of Vito*, 431 Mass. 550, 563-564 (2000). See *Adoption of Rico*, 453 Mass. 749, 754 (2009). Such are the sad facts of this case. Although the judge may well have decided that visitation was nonetheless harmful

---

[12]At trial, Thea stated that she wanted visitation with her mother, but only on her terms.

to Thea, as expressed by her clinicians when the service plan was extended in January, 2007, his decision does not reveal his reasoning or how he exercised his discretion regarding postter-mination visitation. Cf. *Adoption of John*, 53 Mass. App. Ct. at 440.

4. *Due process claim.* Finally, we conclude that the mother's claim that allowing Thea to testify telephonically violated her right to due process is without merit. As the Supreme Judicial Court held in *Adoption of Don*, 435 Mass. 158, 169 (2001), "We are not persuaded that the unique characteristics of a termination of parental rights proceeding require incorporating the art. 12 right of face-to-face confrontation guaranteed to defendants in criminal cases . . . ." Moreover, Thea was institutionalized during the trial and there were logistical dif-ficulties and clinical reasons justifying the judge's exercise of his discretion to allow telephonic testimony. Cf. *ibid.* See gener-ally *Adoption of Roni*, 56 Mass. App. Ct. 52, 54-57 (2002). Accordingly, we conclude that the Juvenile Court judge properly dismissed the mother's due process claim.

Having said that, it may be prudent, if feasible and also ap-propriate from a clinical perspective at that time, to have Thea present in court when on remand she provides testimony. Although the judge found that Thea wanted termination, Thea's testimony indicated some ambivalence and confusion. There was also testimony suggesting that her social worker might have given her unrealistic expectations about benefits she would likely receive should her mother's rights be terminated. Thea's testimony regarding termination may benefit from face-to-face proceedings where the judge would be able to assess not only her words but her demeanor and body language.

*Conclusion.* To the extent that the decree terminates the mother's parental rights as to Thea, it is vacated, and the matter is remanded for further proceedings consistent with this opinion.

*So ordered.*