NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-1363                                          Appeals Court

ADOPTION OF VARIK.[1]


No. 18-P-1363.

Plymouth.     April 5, 2019. - August 16, 2019.

Present:  Agnes, Maldonado, & Sacks, JJ.


Adoption, Dispensing with parent's consent.  Parent and Child,
     Dispensing with parent's consent to adoption, Adoption.
     Minor, Adoption.


     Petition filed in the Plymouth County Division of the
Juvenile Court Department on February 4, 2016.

     The case was heard by Dana Gershengorn, J.


     Lisa Augusto, Committee for Public Counsel Services, for
the father.
     Andrew Don for the child.
     Lynne M. Murphy for Department of Children and Families.


     AGNES, J.  A judge of the Juvenile Court found the father

unfit[2] to parent his son, Varik, and issued a decree terminating

---

[1] A pseudonym, as are all of the names in this opinion.

[2] "Despite the moral overtones of the statutory term
'unfit,' the judge's decision is not a moral judgment, nor is it
a determination that the parent does not love the [child].  The

his parental rights, thereby dispensing with his need to consent to Varik's adoption.[3]  The judge committed Varik to the custody of the Department of Children and Families (department), approved the department's adoption plan, and ordered postadoption visitation between the father and Varik.[4]  Both the father and Varik appeal.  The father argues that the judge abused her discretion in denying his request to continue the trial, in finding him permanently unfit without considering the department's failure to provide appropriate services to address his family's unique needs, and in terminating his parental rights in the absence of an adequate adoption plan.  Varik contends that the adoption plan approved by the judge is deficient and, as a result, the termination decree must be vacated and the case remanded, and that the department failed to make reasonable efforts to provide appropriate services to the father.  We affirm in part and vacate in part.

---

question for the judge is whether the parent's deficiencies place the child[] at serious risk of peril from abuse, neglect, or other activity harmful to the child[]" (quotations and citations omitted).  Adoption of Lisette, 93 Mass. App. Ct. 284, 285 n.2 (2018).

[3] The mother's parental rights were also terminated.  She resides in North Carolina, did not participate in the trial, and is not a party to this appeal.

[4] The order for postadoption visitation provides for three visits, of at least two hours' duration each, per calendar year.

Background.  The judge made eighty-two findings of fact based on the testimony of three witnesses and thirty-one exhibits introduced at trial.  Varik was born in 2008 and was nine years old at the time of the termination of parental rights trial in May, 2018.  The mother and the father have two children together, Varik and Varik's sister, who lives with the mother and the mother's boyfriend in North Carolina.  Varik moved to Massachusetts to live with the father in May, 2015, at age six, after he reported that the mother's boyfriend had cut him with a knife and child protective services in North Carolina became involved with the mother's family.[5]  The father currently lives in Rhode Island with his long-term girlfriend and their daughter, Varik's younger half-sister.

In February, 2016, a mandated reporter filed a report pursuant to G. L. c. 119, § 51A, alleging that Varik had attended school with a swollen, painful hand, and had disclosed that his father "gave him a whoopin' with his hand" the day before, causing Varik to fall on and injure his own hand.  The father picked up Varik from school, telling school workers that Varik was "a liar" and that he would take Varik to the doctor.  Later that day, as part of the emergency investigation pursuant to G. L. c. 119, § 51B, a department investigative worker and a

---

[5] The North Carolina child protection case and related criminal charges were later dismissed.

social worker visited the home.  There they found the father alone because his girlfriend had taken Varik, along with his younger half-sister, to the hospital.  At the hospital, Varik told department social workers that the father had hit him on the legs with a belt the week before.  The father did not visit Varik, who had a hand fracture, at the hospital.  The department took custody of Varik that day and filed a care and protection petition in the Juvenile Court the following day.

Under the service plan prepared by the department, the father's tasks included consistently engaging in counselling to address his anger issues and how the abuse had impacted Varik, exploring alternative methods of disciplining the children, completing a parenting course, and consistently visiting Varik. The father completed the parenting course and participated in some individual counselling addressing his ability to better handle Varik's behaviors and to recognize the causes of those behaviors.  The father's first counsellor terminated services because the father missed several appointments in a row.  The department also had a very difficult time contacting the father to schedule his visits with Varik, and the father missed a number of visits, citing the demands of his work schedule.  To accommodate his work schedule and better facilitate the supervised visits, the department began scheduling the visits at a visitation center on Saturdays.  Despite this accommodation,

the father still missed numerous visits and expressed aggravation if Varik arrived late, blaming the department for his tardiness.[6] As of September, 2016, the father denied abusing Varik and denied any responsibility for Varik being in the department's care.

Throughout this time, Varik remained in a foster home and exhibited troubling behavior, including lying, a series of thefts, and hoarding food on an almost daily basis. Varik's disruptive behaviors at school and in his foster home improved over time as he joined a school social group, began individual counselling, and met with a mentor. By February, 2017, the department determined that the father had made significant gains as a result of his engagement with his service plan tasks and reunified Varik with him. During this period of reunification, an intensive in-home family therapeutic service was put in place, and the department developed a new service plan for the family that included tasks for the father such as continuing counselling to address his anger issues and the impact the abuse

---

[6] The father was arraigned in the District Court on May 5, 2016, on charges of assault and battery by means of a dangerous weapon on a child causing substantial injury; assault and battery by means of a dangerous weapon on a child under age fourteen; and assault and battery. He was released subject to the conditions that he stay away from and have no contact with the victim, Varik, not abuse the victim, and comply with department orders. As a result of the no-contact order, no visits occurred between May and October, 2016.

had on Varik, and exploring alternative methods of discipline that are safe and appropriate for children.

Varik reentered the department's care two months later, in April 2017, when the father and his girlfriend brought him to the department's office and stated that they could no longer care for him, given his troublesome behaviors, and that the father could not handle him without using physical discipline. The father told the department social worker that "the only way for [Varik] to learn [was] through pain." At a subsequent home visit in June, 2017, the father reported to the social worker that it was Varik's fault that he was in the department's custody and reiterated his belief that physical discipline was the best method of addressing Varik's problematic behaviors. Additionally, the father told the social worker that it was "in [Varik's] blood to be bad." In November, 2017, the father, his girlfriend, and Varik's younger half-sister moved to Rhode Island.

Varik was eventually placed in a comprehensive intensive foster care (IFC) home, where he remained at the time of the trial. By May, 2018, Varik was doing well academically, was medically up-to-date, and had graduated from an after-school mentoring program. While he still occasionally exhibited disruptive behavior, such as stealing food or school supplies, he also consistently engaged in therapeutic counselling

treatment, and the department had made a referral for him to resume services with his former therapeutic mentor.  Once Varik returned to the department's care, the father refused to engage in any services that were asked of him and did not participate with the department in any meaningful way toward reunification. The father told the department social worker that he did not need services, and he refused to participate in any further therapy.

In the twelve months leading up to trial in May, 2018, the father visited Varik seven times, often cancelling or not appearing for scheduled visits.  He cited the nature of his seasonal work schedule, which often required him to be out of State for periods of time, as the reason for his frequent absences.  While the father and Varik did have some positive and age-appropriate interactions during some visits, the father on other visits would criticize Varik or primarily discuss the department's case or upcoming court dates with him.  During one visit, Varik had a sudden and severe allergic reaction and was taken by ambulance to the hospital.  The father did not accompany Varik to the hospital and caused Varik great distress by his absence.  The father also did not follow up with the social worker regarding Varik's medical treatment or condition.

In February, 2018, the father indicated to the department an interest in engaging in family therapy.  However, Varik's

therapist at the time reported to the department that family therapy would be "completely inappropriate" given the father's repeated "toxic encounters" with Varik, including a recent telephone call the father had made to Varik during which he blamed Varik for the care and protection case, stated he would never regain custody of Varik, and threatened to move to North Carolina.

Adoption plan.  On November 28, 2017, the department changed its goal for Varik to permanency through adoption.  The department had submitted a request pursuant to the Interstate Compact on the Placement of Children (ICPC) for a home study in South Carolina for Varik's paternal step-grandmother, who had cared for Varik when he was younger; that home study was pending at the time of trial.  Additionally, the department asserted at trial and on appeal that it was working to identify Varik's "Aunt Susan," who had visited with him a few months before trial, as a potential adoption resource.[7]  The adoption social worker further testified at trial that should the ICPC request be denied, the department would proceed to recruitment, using the services of the Massachusetts Adoption Research Exchange,

---

[7] Varik has two aunts named Susan.  The maternal aunt was screened out as an adoption resource, and the department was still attempting to gather more information regarding the paternal aunt named Susan at the time of trial.

and refer Varik to the department's adoption development licensing unit for additional recruitment activities.

The adoption plan did not detail Varik's specific ongoing needs, nor did it describe the specific characteristics of the ideal family that would be recruited by the department or the necessary home environment that would be the best and most appropriate placement for him.

Discussion. 1. Dispensing with parental consent to adoption. "In determining whether to dispense with parental consent to adoption, the judge must not only determine whether a parent is unfit, but [she] must also evaluate 'whether dispensing with the need for parental consent will be in the best interests of the child[ ].'" Adoption of Thea, 78 Mass. App. Ct. 818, 823 (2011), quoting Adoption of Mary, 414 Mass. 705, 710 (1993). This determination requires a "two-part analysis." Adoption of Nancy, 443 Mass. 512, 515 (2005). "First, the judge must find that the parent is presently unfit." Adoption of Cadence, 81 Mass. App. Ct. 162, 167 (2012). Second, the judge must find that the child's best interests would be served by ending all legal relations between parent and child. Id. "That determination includes consideration of the permanency plan proposed by the department" and any such plan proposed by the parents. Id. Because the judge is in a "superior position to evaluate witness credibility and weigh the

evidence, we review her findings with substantial deference and will not disturb those findings unless clearly erroneous."  Id. at 166.  The judge's ultimate determination of parental fitness must, however, be shown to have been proved by clear and convincing evidence to withstand appellate review.  See Custody of Eleanor, 414 Mass. 795, 801-802 (1993).  We give deference to the judge's determination of the child's best interests, and "reverse only when there is a clear error of law or abuse of discretion."  Adoption of Cadence, supra.

In making these determinations, the judge must consider "whether the parent's deficiencies 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.'"  Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011), quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).  This must be determined "by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Mary, 414 Mass. at 711.

"[P]hysical force within the family is both intolerable and too readily tolerated, and . . . a child who has been . . . the victim . . . of such abuse suffers a distinctly grievous kind of

harm."  Custody of Vaughn, 422 Mass. 590, 595 (1996).[8]  The

"failure to follow service plan tasks and visitation schedules

_____

[8] Properly understood, the view expressed in Custody of Vaughn, 422 Mass. at 595, that the use of "physical force" within a family is intolerable, is not in conflict with a parent's right to discipline his or her child.  In Commonwealth v. Dorvil, 472 Mass. 1, 10 (2015), the Supreme Judicial Court addressed the subject of corporal punishment in the setting of a criminal prosecution of a parent, and set forth a framework balancing parental rights and the interests of their children.  The court there stated:

> "[A] parent or guardian may not be subjected to criminal liability for the use of force against a minor child under the care and supervision of the parent or guardian, provided that (1) the force used against the minor child is reasonable; (2) the force is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and (3) the force used neither causes, nor creates a substantial risk of causing, physical harm (beyond fleeting pain or minor, transient marks), gross degradation, or severe mental distress."

Id. at 12.  The court concluded that the evidence that the parent "smacked" his young child (at the time nearly three years old) "once on her clothed bottom" without causing any physical injury was not "sufficient to prove beyond a reasonable doubt that the defendant's use of force was unreasonable or not reasonably related to a permissible parental purpose."  Id. at 13.

In Custody of Vaughn, by contrast, the facts indicated that the father had committed acts of serious violence against the mother and her three children, including the sexual abuse of one child.  422 Mass. at 595.  Clearly, the use of "physical force," based on the facts described in Custody of Vaughn, supra, would find no sanction under the parental privilege recognized in Dorvil, 472 Mass. at 10.  Likewise, the father's physical abuse of Varik is far removed from the scope of the parental privilege recognized in Dorvil.  For cases involving parental conduct that was determined to be criminal notwithstanding an assertion of the parental privilege to discipline a child, see Commonwealth v. Rosa, 94 Mass. App. Ct. 458, 464 (2018); Commonwealth v.

may be relevant to determining parental unfitness."  Adoption of

Leland, 65 Mass. App. Ct. 580, 585 (2006).

Here, the judge's unchallenged findings established that

the father had physically abused Varik.  Even after engaging in

individual counselling and a parenting course to address his own

anger issues and identify alternative methods of discipline, the

father still believed that physical force was necessary to

discipline Varik.  Both of the father's service plans included,

among other things, meeting with DCF, consistently engaging in

counselling, consistently visiting Varik, and refraining from

using physical discipline.  While the department noted enough

improvement in the father when he partially complied with his

initial service plan to eventually reunify Varik with him, the

department saw no improvement from the time Varik returned to

the department's custody in April, 2017, to trial in May, 2018.

The father consistently denied responsibility for Varik being in

the department's custody, instead blaming Varik himself, and he

---

Dobson, 92 Mass. App. Ct. 355, 357-358 (2017); Commonwealth v.
Lark, 89 Mass. App. Ct. 905, 906 (2016).

    We note that the department has a policy that explicitly
forbids "the use of any form of corporal punishment by
foster/pre-adoptive parents upon any foster child(ren)."  110
Code Mass. Regs. § 7.111(3) (2009).  In Magazu v. Department of
Children & Families, 473 Mass. 430, 441 (2016), the court
concluded that the department had the authority to deny an
application to become foster parents solely on ground that the
"parents administer physical discipline to their own children."

believed "it [was] in [Varik's] blood to be bad." Thus, the father's failure to comply with the additional service plan tasks, see Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption, 13 Mass. App. Ct. 936, 937-938 (1982), as well as his demonstrated inability to "achieve[] the essential gains in [his] parenting skills" support the finding of unfitness.[9] Adoption of Paula, 420 Mass. 716, 731 (1995). See Adoption of Lorna, 46 Mass. App. Ct. 134, 143 (1999) (failure to demonstrate benefit derived from provided services may be probative of parental unfitness). The judge's determination that, at the time of trial, the father was not fit to parent Varik is supported by clear and convincing evidence.

2. Adequacy of services. The father, joined by Varik, argues that his unfitness at the time of trial was temporary and was exacerbated by the department's failure to make reasonable efforts to offer services more tailored to his family's specific needs. This assertion is without merit. The department is required to make "every reasonable effort to encourage and assist families to use all available resources to maintain the family unit intact." 110 Code Mass. Regs. § 1.01 (2008). See G. L. c. 119, § 1; Adoption of Ilona, 459 Mass. 53, 60 (2011)

---

[9] Additionally, the judge properly considered the fourteen factors specified in G. L. c. 210, § 3, and found nine applicable to this matter.

("[B]efore seeking to terminate parental rights, the department must make 'reasonable efforts' aimed at restoring the child to the care of the natural parents"). However, this obligation is "contingent upon [the father's] fulfillment of [his] own parental responsibilities," and subject to the department's competing duty "to insure that the child is protected from the absence, inability, inadequacy or destructive behavior of the parent." Adoption of Mario, 43 Mass. App. Ct. 767, 774 (1997). See G. L. c. 119, § 1; 110 Code Mass. Regs. § 1.02 (2008). The two service plans generated by the department were nearly identical, and the judge found that they contained tasks that were "necessary and appropriate" for the goal of reunification, including tasks that had yielded noted improvements in the father's parenting skills previously.

In the weeks leading up to Varik's return to the department's custody, a department social worker attempted to contact the father to confirm and clarify the behavioral problems his girlfriend had reported that Varik was exhibiting and with which they were struggling. The social worker found the father uncommunicative and unwilling to elaborate. The social worker discussed with the father the importance of reengaging in individual therapy as provided in his second service plan, but the father stated he did not need services because he was doing "therapy with himself." Apart from

indicating a willingness to engage in weekend family therapy nine months after Varik reentered care, the father did not otherwise request any specific additional services from the department. Varik's therapist believed that family therapy would negate the progress Varik had made in the intervening months due to the father's failure to consistently attend scheduled monthly visits and his repeated "toxic encounters" and "toxic phone calls" with Varik. Given the father's refusal to fulfill his parental responsibilities by working with the department to reengage in the services asked of him, his failure to benefit meaningfully from his earlier partial compliance,[10] and the department's consistent attempts to accommodate visitation and meetings around the father's work schedule, the judge properly found that the department made reasonable efforts to encourage reunification, and that the tasks within both service plans were necessary and appropriate.

3. Adequacy of adoption plan. Varik and the father next argue that the adoption plan approved by the judge was so deficient that the decree must be vacated and the case remanded. Following a finding of unfitness, the judge "must determine whether the parent's unfitness is such that it would be in the

---

[10] For example, the father continued to believe, in April, 2017, after individual counselling and his completion of a parenting course, that Varik could only learn "through pain."

child's best interests to end all legal relations between parent and child." Adoption of Nancy, 443 Mass. at 515. In determining the best interests of the child, the judge must consider, among other things, "the plan proposed by the department." G. L. c. 210, § 3 (c). The law does not require that the adoption plan be "fully developed" in order to support a termination order, but it must provide "sufficient information about the prospective adoptive placement 'so that the judge may properly evaluate the suitability of the department's proposal.'" Adoption of Willow, 433 Mass. 636, 652 (2001), quoting Adoption of Vito, 431 Mass. 550, 568 n.28 (2000). In determining the sufficiency of the plan, the judge may consider evidence and testimony presented at trial regarding unfitness and the child's best interests, in addition to the written plan. Adoption of Willow, supra at 653. See Adoption of Stuart, 39 Mass. App. Ct. 380, 393 (1995) (judgment reversed where there was lack of written adoption plan combined with social worker's inability to testify as to what type of home would be suitable for each child). In brief, in order to comply with G. L. c. 210, § 3 (c), the department must submit to the judge an adoption plan that is sufficiently detailed to permit the judge to evaluate the type of adoptive parents and home environment proposed and consider whether the proposal is best suited to meet the specific needs of the child.

Here, the adoption plan proposed by the department was inadequate, and the judge therefore abused her discretion in concluding that it was in Varik's best interests. The written adoption plan stated that the department's goal was "[p]ermanency [t]hrough [a]doption." That is an appropriate goal, but in the circumstances of this case, standing alone, it did not convey enough information for the judge to assess the various options that the department was actively considering. The department's plan contained a description of a pending ICPC request for the paternal step-grandmother in South Carolina. If the ICPC request for the paternal step-grandmother was denied, the department planned to proceed to recruitment activities. The adoption social worker testified that Varik had stated that if he could not return to his father, he would like to live with his "Aunt Susan," whose contact information the department had yet to acquire.[11]

In the present case, the adoption plan submitted by the department outlined the goal for Varik's adoption but failed to specify the type of adoptive parents and the characteristics of the home environment best suited to meet his specific needs. Although the plan contained some details of Varik's medical

---

[11] See Adoption of Nancy, 443 Mass. at 518 (children's wishes in custody determinations should be considered by judge but are "neither decisive . . . nor outcome determinative").

history, placement history, and ongoing behavioral issues, this was not a substitute for information describing the kind of home environment and adoptive family makeup that ideally would best meet Varik's particular needs.  Cf. Adoption of Lars, 46 Mass. App. Ct. 30, 32 (1998) (adoption plans for multiple children sufficiently detailed where they identified preferred number of parents in each adoptive household, identified that adoptive parents should be trained regarding each child's specific neurological and behavioral issues, and indicated how many other children of what ages should be in adoptive homes).[12]  We must, therefore, remand this case for further proceedings and findings on this issue.[13]

4.  Termination of parental rights.  In vacating the decree insofar as it relates to the approval of the adoption plan, we also consider whether it was error for the judge to terminate

_____

[12] The judge determined that "the adoption plan proposed by the [d]epartment has sufficient content and substance and it established a superior plan for [Varik], and is in [Varik's] best interests."  The judge also found that there was a pending ICPC request regarding the paternal step-grandmother and that the department's plan is adoption by recruitment.  These findings are not sufficient to establish that the adoption plan satisfies G. L. c. 210, § 3 (c).  Adoption of Dora, 52 Mass. App. Ct. 472, 475 (2001).

[13] We do not hold nor are we suggesting that an adequate plan once approved by the judge is binding on the department, because circumstances may change and the best interests of Varik may require adjustments in the adoption plan.  Furthermore, under G. L. c. 119, § 29B, there is an annual judicial review of the department's permanency plan for children in its care.

the father's parental rights.  It is important to consider that the judge found that throughout the pendency of this case the father failed to acknowledge any responsibility for the care and protection of Varik, continued to believe that the only way to remedy Varik's problems was to physically punish him, and, following a failed effort at family reunification in 2017, refused to engage in any of the services offered by the department.  As the judge noted, the father was offered services designed to remediate his parenting deficiencies and to protect Varik from abuse, but the father failed to engage in many of these services and "failed to consistently follow through with appointments, services, visitation, and court appearances."  On the record before us, the judge was warranted in concluding not only that the father was incapable of providing appropriate care and custody for Varik at the time of trial, but also that the father's shortcomings were "likely to continue into the indefinite future to a near certitude."  See Adoption of Nancy, 443 Mass. at 517 (judge is not required to grant father indefinite opportunity to remedy parenting deficiencies). "Where there is evidence that a parent's unfitness is not temporary, the judge may properly determine that the child's welfare would be best served by ending all legal relations between parent and child."  Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012).

Relying on Adoption of Dora, 52 Mass. App. Ct. 472, 479 (1978), and several other cases, the father argues that judicial approval of an adequate adoption plan is a necessary "precondition" to a decision that parental rights should be terminated, and that, as a result, we should vacate the portion of the decree that terminates his parental rights. In Adoption of Dora, supra, the department and the parents advocated competing plans. The department's plan called for the child to be adopted by her foster parents, while her father proposed that she be placed with a paternal uncle in California. The judge did not indicate which of these alternative plans was in Dora's best interests. Id. at 473-474. On appeal, this court concluded that it "was not appropriate" for the judge to leave to the department the decision about which adoption plan was best for the child, subject only to review by the adoption judge. Id. at 476. In such circumstances, an order terminating parental rights was premature because it would deprive the biological parents of standing to "advocate their point of view" regarding which one of the competing plans should be approved. Id. In the present case, by contrast, the father has not proposed an adoption plan, and there are no competing plans that must be assessed by the judge.

Our decision in Adoption of Thea, 78 Mass. App. Ct. 818, 825 (2011), is not to the contrary. There, the court faced an

unusual set of circumstances involving an "extremely high risk" teenager who was approaching her eighteenth birthday and was in an unstable placement (a long-term hospitalization unit).  Id. at 824.  Based on the absence of any identifiable plan in place for Thea, "inadequate" findings by the judge as to why termination of parental rights would be in her interests, and the possibility that she would return to live with her mother after her eighteenth birthday, we not only remanded the case for consideration of a plan but also vacated the portion of the decree that terminated parental rights.  Finally, in Adoption of Stuart, 39 Mass. App. Ct. at 393, where the department presented no adoption plans and there was no testimony regarding the type of homes sought for the children, and the evidence did not establish parental unfitness at the time of trial, we concluded that the order terminating parental rights should be vacated. In Adoption of Stuart, unlike the present case, the judge's entire focus was on the mother's past unfitness.  The judge overlooked significant progress made by the mother since her children were removed.  Id. at 391-392.  By contrast, in this case, the judge found that the father had made no progress in addressing his parenting deficiencies since the date of the failed effort at family reunification in 2017.  The department is "not required to . . . relitigate the rights of an unfit parent" whenever there is a change in circumstances.  Adoption of Willow, 433

Mass. 636, 647-648 (2001). Here, for the reasons stated earlier, the judge was warranted in concluding that there were "grievous shortcomings" in the father's efforts to parent Varik that placed Varik at serious the risk of harm, that would not be remedied in the foreseeable future, and that justified the termination of the father's parental rights. See Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997). As in Adoption of Cadence, 81 Mass. App. Ct. at 174, we may remand the matter for further proceedings with regard to the department's proposed adoption plan without vacating that portion of the decree that terminates the father's rights.[14]

Conclusion. We affirm the decree insofar as it adjudicates Varik in need of care and protection under G. L. c. 119, § 26, and terminates the father's parental rights pursuant to G. L.

---

[14] The father also argues that the judge abused her discretion in denying his request for a continuance. "Whether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge . . . ." Care & Protection of Quinn, 54 Mass. App. Ct. 117, 120 (2002). See Mass. R. Civ. P. 40 (b), 365 Mass. 802 (1974) ("Continuances shall be granted only for good cause"). The trial was originally scheduled to begin on April 9, 2018. It was continued to May 30, 2018, due to the judge's schedule. That date was agreed to by all counsel on April 30, 2018, a day when the father was present in court. On the trial date, the father's counsel did not know why his client was absent and was unable to reach him by phone. It was assumed that the father was working out of State. The judge noted that the case was more than two years old. Based on these considerations, the judge did not abuse her discretion in denying the motion to continue. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

c. 210, § 3.  We vacate that portion of the decree approving the department's adoption plan and remand this matter so that the judge may promptly, after an evidentiary hearing if necessary, consider an adequate adoption plan.

So ordered.