## CARE AND PROTECTION OF BRUCE.

No. 97-P-2077.

Plymouth. March 5, 1998. - May 14, 1998.

Present: KASS, JACOBS, & PORADA, JJ.

*Evidence,* Child custody proceeding, Report of licensed social worker, Communication between patient and psychotherapist. *Adoption,* Care and protection, Dispensing with parent's consent. *Parent and Child,* Care and protection of minor, Dispensing with parent's consent to adoption. *Privileged Communication. Waiver.*

In a care and protection proceeding, the judge's finding that the mother was unfit to be a parent by reason of her mental illness, and his judgment granting the Department of Social Services custody of the child, were not supported by clear and convincing evidence: the matter was remanded for further proceedings. [763-764, 766]

In a care and protection proceeding, the mother's attorney's cross-examination of the mother's treating psychiatrist about communication contained in records of the mother's admission to a psychiatric facility constituted a waiver of the mother's privilege under G. L. c. 233, § 20B, with respect to those records. [764-765]

In a care and protection proceeding, there was no error in the judge's failure to give a report or summary to the parties of the content of a hearing in chambers pursuant to G. L. c. 233, § 20B, to determine whether the psychotherapist-patient privilege was applicable to otherwise relevant testimony. [765]

In a care and protection proceeding, the judge correctly ruled that various letters and an affidavit of agents of the Department of Social Services were admissible under G. L. c. 119, § 21, and appropriately redacted opinion, conclusions, diagnoses, and evaluations, leaving only statements of facts therein. [765-766]

PETITION filed in the Brockton Division of the District Court Department on January 31, 1994.

The case was heard by *Robert F. Murray,* J.

*Ann Wagner* for the mother.

*Stephen Dick,* Assistant Attorney General, for Department of Social Services.

*Daniel R. Katz* for the child.

KASS, J. For the first two and one-half years of her son Bruce's life, his mother, Laura,[1] took better than adequate care of him. The child was born June 13, 1991. On January 30, 1994, Laura called the police for assistance and wound up in Pembroke Hospital, a psychiatric facility. Laura had manifested paranoid delusions. She had told police and medical personnel at Cardinal Cushing Hospital, to which she had initially been taken, that her apartment contained poisonous gas that had made her ill. Unknown men, she said, were bringing poison to her apartment. The air, water, and food were contaminated. No one could smell the gas because they were being paid off by the mafia. Residents of her apartment house were coming into her apartment to poke her son's eyes out and, while he slept, to sexually abuse him.

Bruce was immediately taken into custody by the Department of Social Services (DSS) and placed temporarily with Laura's sister. Laura was discharged from Pembroke Hospital after two weeks. The child remains in the custody of DSS to this day.[2] At the time of argument of this case before us in March, 1998, Bruce was seven years old. For six days scattered throughout June, July, August, and September of 1995, a petition for care and protection brought by DSS was tried before a judge of the District Court. See G. L. c. 119, §§ 24-26. Those proceedings ended in an order entered December 13, 1995, committing Bruce to the custody of DSS until May 16, 1996. In the meantime, under the judge's order, DSS was to make every reasonable effort to bring about the reunification of Laura with Bruce. Laura filed a notice of appeal from the order of December 13, 1995, which adjudged Laura unfit at the time to be a parent to Bruce.[3] The case was not fully briefed in this court until February 9, 1998.[4]

On April 26, 1996, DSS moved to amend its care and protection petition to include a request that the court consider whether

[1]The names Bruce and Laura are fictitious.

[2]In July, 1994, after having cared for Bruce for four months, Laura's sister began to advocate in Laura's behalf for the return of Bruce to Laura's care. At that point, DSS placed Bruce in the foster care of an unrelated person.

[3]The biological father is not in the picture and is not involved in the appeal.

[4]The slow pace at which Bruce's case has been conducted has a tendency to skew the result in that the bonds between the child and his foster parents will have grown stronger (see G. L. c. 210, § 3(*c*)(vii)) while the tie with the biological mother becomes frayed.

dispensing with the parent's consent to adoption would be in the child's best interests. See G. L. c. 119, § 26, and G. L. c. 210, § 3. That motion was allowed more than a year later, on April 30, 1997, and as of the time of oral argument before us, a date had not yet been set for a hearing on that issue. The care and protection order of December 13, 1995, will, therefore, be superseded, but consideration of the validity of the finding supporting that order is significant to the parties because the judge who presides at the hearing to determine whether to dispense with the consent to adoption may consider as evidence the findings made in the care and protection phase. *Adoption of Simone*, 427 Mass. 34, 43 (1998). See *Adoption of Frederick*, 405 Mass. 1, 5-6, 12 (1989); *Adoption of Paula*, 420 Mass. 716, 721-722 (1995). While not binding, the earlier findings have heft in the later stage.

1. *Validity of the finding of unfitness.* Laura was discharged from her two-week sojourn in a psychiatric hospital in 1994 with a diagnosis of "bipolar disorder, manic with psychotic features" plus posttraumatic stress disorder and with prescriptions for trilafon, lithium, and valium to control her symptoms. Laura has not required readmission to a hospital facility. She has continued to see a psychologist and a psychiatrist but she has declined to take her medication, except occasionally valium.

There lies the focus of the controversy. DSS insists, and the trial judge so found, that unless Laura takes the lithium prescribed for her, her personality disorder is such that the child will be at unacceptable risk. Laura refuses the lithium because she says that she suffers intolerable side effects and claims to be able to function without psychotropic medication. It is a considerable difficulty of the case that the finding of unfitness is entirely predictive. Laura was never allowed to have custody of Bruce again after her brief hospitalization in February, 1994, and there is, therefore, no empirical evidence of the mother's inability to cope unless treated with lithium. Yet prior to the February, 1994, hospitalization, Laura took quite good care of Bruce, without lithium. Bruce's' pediatrician, Dr. Howell, described the child as healthy and Laura as "always highly, highly interested in the welfare of [Bruce]." "She was always concerned about his safety with regard to the foods he ate, the playground he played at, the yard he played in . . . . I felt that those concerns were too much for the situation that she said she lived in." "I never had concerns about neglect or abuse. My

concern was always just that she [Laura] was really, really over concerned about things I felt she didn't need to be. But she never took care of Bruce in an inappropriate way."

To be sure, the record tells us, and the trial judge found, that Laura had been an extremely overprotective mother, given to exaggerated apprehension of danger and prone to elevate minor illness into major crisis. Some of Laura's attitudes about a hostile world rubbed off on Bruce who, for example, took to sniffing rugs for the presence of poison gas. One would wish for Bruce less smothering devotion and less exposure to paranoia. The inquiry in these cases, however, is not whether the parent is a good one, let alone an ideal one; rather, the inquiry is whether the parent is so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641-646 (1975). *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 591-592 (1981). *Adoption of Katharine*, 42 Mass. App. Ct. 25, 28 (1997). *Guardianship of Clyde, post* 767 (1998).

Throughout the period of separation from her child, Laura has been attentive to visits, which, after Bruce left Laura's sister's care, were in supervised circumstances and in confined spaces. The book against Laura, in the testimony of a foster mother who was present at the visits and in the judge's findings, is that Laura loved too well but not wisely. She brought too much food and too many gifts for Bruce and she pushed him to eat when he wasn't hungry. Some visits went well; during others, Bruce became fractious. Accounts of visits between mother and child yielded no definitive indicia about the mother's fitness.

The attention of the judge was concentrated not on what had occurred between mother and child but on what was predictable. Although there was nothing to go on in the way of past abuse or neglect, the judge was not bound to wait for a disaster to happen if that seemed close to inevitable. He could use past conduct, medical history, and present events to predict future ability and performance as a parent. *Custody of Two Minors*, 396 Mass. 610, 621 (1986). *Custody of Michel*, 28 Mass. App. Ct. 260, 269-270 (1990). *Adoption of Katharine*, 42 Mass. App. Ct. at 32-33. In looking into the future, the judge relied on the testimony of a psychologist, Dr. Marion Encarnacion, and a

psychiatrist, Dr. Phelps Robinson. The judge relied as well on his own observations of Laura.

Dr. Encarnacion testified that

> "all of the concerns that Laura has brought to me about her son have been appropriate with her ideas about what might be going on or what might have been happening in his emotional life and how she might provide for them have been appropriate . . . when we talked about her son, she's able to be very thoughtful about that, able to take in information, able to be fairly realistic about him and that her concerns are appropriate."

Opposed to this obviously positive appraisal, Dr. Encarnacion observed several manic aspects of bipolar one disorder: grandiose behavior, racing thoughts or flights of ideas, distractibility, and excessive activity. Those characteristics, particularly her excessive talking, might, Dr. Encarnacion thought, "affect her ability to keep her child safe if someone has to tell her about a danger." Without medication, Dr. Encarnacion said, Laura would not be a safe parent to Bruce. She had not, however, ever observed Laura with Bruce.

Dr. Robinson was the psychiatrist to whom Laura was referred for treatment of her mental illness. He concurred with the diagnosis of bipolar disorder, describing Laura as

> "circumstantial and rambling in her presentation with a lot of self-justification being a prominent feature. She was disorganized and barely coherent. There was massive denial throughout. . . . Certainly her mood was more excited than depressed . . . . And I felt that she was caught between her single minded wanting what she wanted, which was the return of her child on one hand, and refusing the very treatment that would probably get it for her on the other hand."

That treatment, Dr. Robinson testified, was lithium or a similar drug, depakote. Dr. Robinson had not seen Laura with her child and had no information on that score. Pressed by the trial judge about what the effect failure to take medication would have on Laura's ability to parent her child, Dr. Robinson said, "That was not my primary focus, but I do recall thinking about that. And without treatment, I felt that her parenting was compromised."

The judge had the opportunity to observe Laura as a witness and a spectator in the courtroom. He found her responses and reactions to be consistent with the symptoms of bipolar disorder as described by Dr. Encarnacion and Dr. Robinson. The judge found that Laura often "tended to answer in long rambling narratives. Her responses too often were impulsive and poorly organized. . . . She often appeared agitated and overwrought."

What emerges clearly and convincingly from the judge's subsidiary findings and from the evidence that supports those findings is that Laura suffered from bipolar disorder (although she was never described as other than in a manic state). The connection between that illness and inability to be a fit parent, however, was neither clear nor convincing. To the extent he had thought about that, Dr. Robinson was prepared to say no more than that her abilities as a parent would be "compromised." Dr. Encarnacion was less equivocal although she was reduced to basing her prediction of risk on the premise that "she might be too busy to notice a danger," while recognizing that Laura had apparently done fairly well taking information from her pediatrician and parenting counselor.

We appreciate the difficulty of the trial judge's task in a care and protection case. We are also well aware that the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference. *Custody of Two Minors*, 396 Mass. at 618.[5] As in *Custody of Eleanor*, 414 Mass. 795, 800 (1993), however, "[i]t does not follow . . . that the findings, taken together, proved parental unfitness by clear and convincing evidence." We are of opinion that the ultimate finding of unfitness and the extreme step of taking a child away from a

---

[5]Two subsidiary findings, as the brief for the mother is at pains to point out, did not match up with the evidence and in that sense were clearly erroneous. The judge found that Bruce's pediatrician described him "as a difficult child to manage; demanding and defiant, far more so than the average child." Dr. Howell had, in fact, described Bruce as "a difficult to manage child. I guess, mildly difficult to manage child. Demanding. A little bit defiant. And some noncompliance there. A little more than average, more than average. . . ." Dr. Howell had also testified that Bruce's "behavior did improve" when he was with his aunt and later a foster mother. On the basis of that testimony, the judge found that "Bruce's behavior improved rapidly and dramatically after he was placed outside of his home environment. . . ." The differences between testimony and finding are essentially adjectival and do not, by themselves, constitute serious defects in the judge's findings. In relation to the testimony, these two findings are surely hyperbolic. In terms of the over-all case, the distorted findings are not outcome determinative.

mother in this case required either history of abuse or neglect or prognostications that are more firmly based than those offered by the experts in this case. See *Adoption of Stuart*, 39 Mass. App. Ct. 380, 381-383 (1995); *Adoption of Iris*, 43 Mass. App. Ct. 95, 101-102 (1997). Unlike *Adoption of Quentin*, 424 Mass. 882, 887-889 (1997), which also involved a mother with mental impairments, there is no evidence of children being forced to beg for money, absence of a place to stay, unsanitary living conditions, and sexual abuse. All we know from the evidence about Laura *in relation to her child* is that she took good — too good — care of him and that when dealing with the child's pediatrician and parent counselors, Laura's conduct was more rational than in circumstances where her sanity was directly confronted. The statute governing compelled adoption recognizes the significance of mental illness in relation to the assessment of parental fitness and says that the mental illness must be such as "makes the parent . . . unlikely to provide minimally acceptable care of the child." G. L. c. 210, § 3(*c*)(xii). Yet we learn from the record that Laura, even while barred from custody of her own child, was, without untoward incident, taking care of her older sister's children while the sister worked as a nurse.

Underlying the history of Laura and Bruce since Laura's hospitalization in February, 1994, is the conviction of DSS, central to its service plan, that Laura needs medication to function well: no medication, no child. Missing is any testing of whether Laura, post-hospitalization, might function as acceptably as she had before. The ultimate finding of parental unfitness and the consequent judgment granting DSS custody of Bruce are not supported by clear and convincing evidence.

2. *Evidentiary issues.* As a second stage of proceedings regarding Laura and Bruce, whether Bruce's best interests require entry of a decree dispensing with consent to adoption, is still to be tried, we touch on three evidentiary issues raised by Laura because they may recur.

(a) *Psychiatric records.* Laura objects to the admission of portions of her psychiatric records at Pembroke Hospital. In a line of cross-examination exploring the diagnosis of bipolar disorder, Laura's counsel questioned Dr. Robinson extensively about communications in those records that normally would be privileged under G. L. c. 233, § 20B. Prescinding from the question whether the privileged status of that material might have given way to a determination of significance under G. L.

c. 233, § 20B(*e*), the questioning about those records by Laura's counsel constituted a waiver of the privilege, as the judge correctly ruled. See *Commonwealth* v. *Goldman*, 395 Mass. 495, 500, cert. denied, 474 U.S. 906 (1985); *Commonwealth* v. *Clancy*, 402 Mass. 664, 667-668 (1988); *Neitlich* v. *Peterson*, 15 Mass. App. Ct. 622, 627 (1983); *Adoption of Abigail*, 23 Mass. App. Ct. 191, 198-199 (1986).

(b) *Psychiatrist's voir dire testimony.* Before receiving testimony from Dr. Robinson (the psychiatrist), the trial judge conducted a hearing in chambers, conformably with G. L. c. 233, § 20B(*e*), to decide whether the psychotherapist privilege should apply. The statute requires that the privilege shall not apply if the judge, "in the exercise of his discretion, determines that the psychotherapist has evidence bearing significantly on the patient's ability to provide suitable care or custody, and that it is more important to the welfare of the child that the communication be disclosed than that the relationship between patient and psychotherapist be protected." G. L. c. 233, § 20B(*e*), as appearing in St. 1986, c. 594. The judge did determine that Dr. Robinson had things to say that were relevant to the parental fitness issue.

Laura claims on appeal that it was error for the judge not to have made available to her the content of the judge's in-chambers examination of Dr. Robinson. Arguably, what Dr. Robinson had to say about Laura's fitness when examined in chambers was even more equivocal than his testimony in open court. It would have required exceptional recall on the part of the judge, who did not have the benefit of simultaneous transcription, to perceive and then report to the parties relatively subtle differences in testimony. No party asked for such a report or summary at trial. It would have been a highly doubtful request. The purpose of the voir dire examination was to enable the judge to decide the privilege question, not to produce evidence that might be useful for cross-examination. There was no error on this score.

(c) *Admission of various letters and an affidavit prepared by DSS personnel.* Six written reports to the District Court and one affidavit (one of the reports was by a licensed social worker made to the court under G. L. c. 119, § 21) included hearsay, evaluations, opinions, and recommendations. Laura claims these documents were wrongly received in evidence. It lay in the judge's discretion to admit any report from a DSS worker who

made an "investigation of the facts relating to the welfare of the child." G. L. c. 119, § 21. See *Care and Protection of Benjamin*, 403 Mass. 24, 27 n.5 (1988).

The first of two conditions that limit the receipt in evidence of DSS reports is that the reports must either be limited to a statement of facts, or redacted to exclude opinion, diagnosis or evaluation. See *Custody of George*, 27 Mass. App. Ct. 265, 272-274 (1989); *Custody of Michel*, 28 Mass. App. Ct. at 266-267. The second condition is that opposing parties must be able to cross-examine the author of the report, should they request so to do. G. L. c. 119, § 21. See *Custody of Tracy*, 31 Mass. App. Ct. 481, 486 (1991).

The judge correctly ruled that the reports and affidavit were reports of agents of DSS that were admissible and appropriately redacted matter that constituted opinion, conclusions, diagnoses, and evaluations.

The judgment is reversed. Much time has passed since the case was tried. We know nothing about Laura's current status or the current status of Bruce. Jurisdiction of care and protection cases now lodges with the Juvenile Court. The case is remanded to the District Court for an inquiry, consistent with this opinion, into whether Bruce can safely be returned to the custody of Laura, with monitoring of that arrangement by DSS. DSS may bring forward for hearing the pending aspect of its petition asking for an order to dispense with consent to adoption, at which findings from the care and protection proceeding may not be received in evidence. In view of the transfer of jurisdiction under St. 1992, c. 379, § 8, of care and protection cases to the Juvenile Court, the parties, to the end that the case may proceed as speedily as possible in the court granted specialized jurisdiction, may wish to apply to the Chief Justice for Administration and Management for a transfer of the case to the Juvenile Court serving the area where Laura lives.

*So ordered.*