NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-522

ADOPTION OF ADDI (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree and judgment issued by a Juvenile Court judge finding her unfit as to her two children,[2] terminating her parental rights with respect to her daughter, and finding that the separate permanency plans proposed by the Department of Children and Families (DCF) were in each child's best interests.[3]  On appeal, the mother claims that the judge erred by finding her unfit and abused her discretion by approving DCF's permanency plans.  We affirm.

---

[1] Care and protection of Robert.

[2] Both of the children's names are pseudonyms.

[3] The daughter's putative father failed to appear at the temporary custody hearing or the trial in this matter.  The judge found him unfit and terminated his parental rights.  The son's father was present at trial via Zoom, as he had been previously deported to Brazil after an alleged incident of domestic violence against the mother.  The father stipulated to the judgment that he was unavailable to parent his son.  The judge found the son's father currently unfit but did not terminate his parental rights.

Discussion.  The mother first argues that the judge erred by determining that DCF met its burden to establish her parental unfitness clearly and convincingly because the findings do not show any nexus between her mental health and substance abuse issues and her ability to provide the minimally acceptable level of care to her children.  We disagree.

"When reviewing a decision to terminate parental rights, we must determine whether the trial judge has abused his discretion or committed a clear error of law."  Adoption of Elena, 446 Mass. 24, 30 (2006).  "[T]he judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference" (citation omitted).  Adoption of Quentin, 424 Mass. 882, 886 (1997).

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).  "Clear and convincing evidence is evidence that is 'strong, positive and free from doubt.'"  Adoption of Lisette, 93 Mass. App. Ct. 284, 293 n.14 (2018), quoting Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 871 (1975).  The evidence "must be sufficient to convey a high degree of

2

probability that the proposition is true" (quotations and citations omitted). Adoption of Rhona, 57 Mass. App. Ct. 479, 488 (2003) (Rhona I).

"Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Quentin, supra, quoting Adoption of Mary, 414 Mass. 705, 711 (1993). A trial judge is permitted to use "past conduct, medical history, and present events to predict future ability and performance as a parent." Care and Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998). "Evidence of alcohol or drug abuse is also relevant to a parent's willingness, competence, and availability to provide care." Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008). However, there must be some nexus between such evidence and parental fitness. See Care and Protection of Bruce, supra at 763.

In this case, the evidence presented at trial showed that the mother has an extensive history of substance use and mental health issues that have "remained effectively untreated throughout the duration of this case." The mother admitted to abusing heroin and prescription drugs until she was three and a half months pregnant with the daughter, as well as to using marijuana throughout that pregnancy. DCF expressed its concerns

3

regarding the mother's marijuana use during pregnancy and while serving as the primary caretaker for the child. Despite this admonition, the mother tested positive for methadone and marijuana on six occasions during her second pregnancy, and the son was born with both substances in his system. As a result, the son suffered from muscle tightness in his legs, causing his legs to be bowed and his feet turned in.

A report filed pursuant to G. L. c. 119, § 51A (51A report) was filed a year prior to the son's birth because the daughter allegedly witnessed an altercation between the mother and the mother's brother, which resulted in the maternal grandparents filing a restraining order against the mother. The reporter cited concerns about the mother's history of substance use, especially with heroin; potential relapse; and behavior with other household members, including her fighting with family and calling her parents vulgar names while the daughter was present. The maternal grandmother alleged that the mother left the daughter unsupervised and that she had left drug paraphernalia in her room at the maternal grandparents' house.

Although she has received substance abuse treatment on and off since 2013, the mother has frequently relapsed. Because of ample evidence indicating the contrary, the judge did not credit the mother's testimony that she had been sober for four years

before relapsing in August of 2021[4] and then had been sober since, up to the time of trial.

Regarding the mother's mental health issues, she testified at the time of trial that she was diagnosed with anxiety, depression, and post-traumatic stress disorder, and she has also been diagnosed with attention-deficit hyperactivity disorder. The mother was first civilly committed pursuant to G. L. c. 123, § 12, in 2014. The mother's mental health took a steep decline in the summer of 2020, when she began exhibiting delusions, paranoia, and possible hallucinations. As the judge described, "[the mother] was certain she was being followed, that DCF was tapping her phone, that she was fighting monsters/goblins, and that everyone was against her. Her moods were erratic and oscillated unpredictably between happy and sad." The mother's delusional thinking was also evident in her inappropriate interactions with and beliefs regarding her former social worker. The mother was civilly committed twice between the summer of 2020 and April of 2021, and she also went to the hospital at least three times in February of 2021, alone, for extreme anxiety and panic attacks.

---

[4] On August 20, 2021, the police responded to a possible overdose at the mother's residence, where she was found with ice on her and an empty Narcan container next to her.

After describing the mother's substance abuse and manifestations of her mental illnesses, the judge made several conclusions of law in which she described how the mother's issues impacted her ability to parent the children. The judge determined that the "[m]other's concerning behaviors, delusions, paranoia, substance use, and history of housing instability[5] are barriers to her providing a safe and stable environment for her children. Because she has not successfully addressed any of these issues and has not demonstrated an enduring ability or desire to do so, [the mother] is unable to provide for the care and protection of the subject children and this inability is likely to persist for the foreseeable future." Most notably, the judge stated:

> "What makes [the mother's] problematic behavior more
> concerning is that it sometimes occurs in the presence of
> the children. On many occasions, [the mother] failed to
> maintain appropriate conversations in front of the
> children, and she had to be redirected a number of times
> during in-office visits. [The mother] has difficulty
> maintaining boundaries and refraining from inappropriate
> conversations. This has resulted in chaotic and
> disorganized visits with the children. [The mother] has
> been unable to demonstrate positive parenting skills during
> her visits with the children throughout the pendency of
> this case. Although she has required less direction during
> more recent visits, she continues to speak poorly of the
> maternal grandparents in front of the children and does not
> engage in appropriate conversations with her children.
>
> Since this petition was filed, [the mother] has been unable
> to appreciate the problematic nature of her behavior, and

---

[5] At the time of trial, the mother's housing instability had been ongoing since approximately June of 2018.

6

she continues to believe that her behavior does not pose a threat to her children or impact her parental fitness. Due to [the mother's] substance use, mental health concerns, and inappropriate behaviors towards others involved in this case, the Court finds that [m]other is unable to provide a stable environment for the children."

Even further, the judge stated that the mother

"has shown an inability to control unparental traits of character or conduct and to appreciate how this behavior impedes her ability to perform her parental obligations . . . [and the mother's] delusional, paranoid, and erratic behavior poses a risk to herself and those around her. [The mother] has been unstable for a significant period of time and even after reportedly participating in numerous treatment programs and therapy, these behaviors have not been ameliorated."

The above-mentioned conclusions, in addition to others not mentioned herein, establish a nexus between the mother's substance use and mental health issues and her ability to parent the children. See Adoption of Jacques, 82 Mass. App. Ct.at 609.[6]

We also disagree with the mother's claim that the judge erred in finding that DCF's permanency plans, which propose that the daughter be formally adopted by her maternal grandparents and the son be reunified with his father once the father's

---

[6] The mother also erroneously argues that the judge ignored or overlooked significant evidence favorable to the mother in finding her unfit. The judge made numerous findings of fact that were favorable to her, including those detailing the mother's engagement with treatment, how her "house was clean and neat," that she had been consistent with her visits, and that she "has a well-developed bond with both children and likes to bring activities and snacks to her visits." To the extent the judge erred in failing to include any other favorable evidence in her findings, such evidence does not outweigh the evidence indicating the mother's parental unfitness.

temporary unavailability has abated, are in each child's best interests. "In determining whether the best interests of the child will be served by issuing a decree dispensing with the need for consent [to adoption] . . . , the court shall consider the ability, capacity, fitness and readiness of the child's parents or other person named in [G. L. c. 210, § 2,] to assume parental responsibility, and shall also consider the plan proposed by the department or other agency initiating the petition." G. L. c. 210, § 3 (c). "The 'best interests of the child' standard requires the trial judge to make a discretionary decision based on her experience and judgment, and [it] will not be overturned unless it amounts to an abuse of discretion or a clear error of law" [citation omitted]. Adoption of Garret, 92 Mass. App. Ct. 664, 675 (2018).

As discussed above, the mother is unfit to care for both children. Regarding adoption of the daughter, she began residing with the maternal grandparents in September of 2020 and continued to do so at the time of trial. The maternal grandparents have been "the only stable caregivers that [the daughter has] known," and she has benefitted from the structure, predictability, and consistency of the home. Additionally, "there has been no evidence of any risk to the children while in their maternal grandparents' custody" or "that the maternal grandparents are inappropriate or irresponsible caregivers."

8

"The Supreme Judicial Court has emphasized the importance of achieving stability and permanency in children's lives and in decrees dispensing with parental rights."  Adoption of Thea, 78 Mass. App. Ct. 818, 824 (2011).  Thus, we see no abuse of discretion or error in the judge's determination that adoption of the daughter by the maternal grandparents is in her best interests.

Nor is there any abuse of discretion in the judge's treatment of DCF's current plan to reunify the son with his father.  Parents possess a "natural right to the custody of their children."  See Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, 383 Mass. 573, 587 (1981).  The judge found that the nature of the relationship between the mother and the son's father "as it relates to actual domestic violence" was "uncertain."  Moreover, at the time of trial, the son had monthly visits with his half-brothers on his father's side and weekly virtual visits with his father.  The record indicates that the son's father has been teaching him how to speak Portuguese and will allow him to maintain his relationship with his American family if the son does move to Brazil.  Based on the differences between the children as to age, their involvement with DCF, and relationship with their fathers, the judge recognized that different permanency plans could be in their best interests.  See Adoption of Garret, 92 Mass. App. Ct.

9

at 675-676 (concluding no abuse of discretion in judge's differing best interests determinations). However, the judge did not approve DCF's plan for reunification with the father. Indeed, the judge declined to terminate the mother's parental rights, pointedly leaving open the possibility that her unfitness as to the son "could be appropriately addressed through service engagement and evidence of positive parental progress." Finally, the son will remain in the care of his maternal grandparents until the father's availability is

10

established, giving the mother the opportunity to ameliorate the concerns leading to the son's removal in the meantime.[7]

<u>The decree terminating the mother's rights as to Addi is affirmed.  The judgment as to Robert is affirmed.</u>

By the Court (Meade, Massing & Sacks, JJ.[8]),

*Anne M. Thomas*

Assistant Clerk

Entered:  January 4, 2024.

---

[7] The mother's claim that terminating her parental rights as to the daughter was improper because the maternal grandparents could have received a guardianship of her is waived, as she did not request a guardianship below.  See <u>Petition of Dep't of Soc. Servs. to Dispense with Consent to Adoption</u>, 392 Mass. 696, 697 (1984).  The mother's remaining claim, that a sibling visitation order should have been granted, is premature at this time because both siblings are currently residing with the maternal grandparents.

[8] The panelists are listed in order of seniority.