APPEALS COURT 
 
 ADOPTION OF BRECK[1]

 
 Docket:
 24-P-450
 
 
 Dates:
 February 11, 2025 – July 9, 2025
 
 
 Present:
 Massing, Hershfang, & Tan, JJ.
 
 
 County:
 Bristol
 

 
 Keywords:
 Adoption, Care and protection, Dispensing with parent's consent, Visitation rights. Minor, Adoption, Care and protection, Visitation rights. Parent and Child, Adoption, Dispensing with parent's consent to adoption, Care and protection of minor. Evidence, Child custody proceeding. Practice, Civil, Care and protection proceeding, Adoption, Findings by judge. Department of Children & Families. Indian Child Welfare Act.
 
 

       Petition filed in the Bristol County
Division of the Juvenile Court Department on May 11, 2021. 
      The case was heard by Tracie L. Souza, J.
      A motion to stay appellate proceedings and
for leave to file a motion for a new trial was considered in the Appeals Court
by Shin, J.
      Lynn M. Isaman for the father.
      Alan D. Campbell for the mother.
      Claire Gilchrist for Department of
Children and Families.
      Richard S. Showkier for the child.
      TAN, J. 
The mother and the father appeal from decrees entered by a Juvenile
Court judge adjudicating them unfit to parent their son, Breck (child or
Breck), and terminating their parental rights. 
The parents contend, among other things, that the Department of Children
and Families (department) failed to establish a nexus between their substance
misuse and their parental unfitness for Breck, that the fitness determination
cannot stand for that reason and others, and that the department failed to make
reasonable efforts to reunify them with the child.  They also argue for the first time on appeal
that the decrees should be vacated because, under the Indian Child Welfare Act,
25 U.S.C. §§ 1901 et seq. (ICWA), Breck is newly recognized as an Indian child,
and the judge should have applied the ICWA's heightened protections.  The mother further argues that the judge
erred in approving the department's plan of adoption and in declining to order
posttermination and postadoption contact. 
Discerning no error or abuse of discretion, we affirm.[2]
      1.  Background. 
We summarize the trial judge's findings of fact, supplemented by
uncontroverted evidence from the record, and reserve certain facts for later
discussion.  Both parents have
significant substance misuse disorders and mental health histories that started
long before the child's birth.
      a. 
The mother.  The mother's lifelong
struggle with substance misuse began when she started drinking alcohol at age
eleven and using drugs as a teenager. 
She has used Percocet, cocaine, Ecstasy, heroin, Xanax, and
fentanyl.  The mother also has a history
of mental illness, for which she has failed to seek consistent treatment.  She has been diagnosed with bipolar disorder,
depression, anxiety, and posttraumatic stress disorder (PTSD).
      The mother has four older children who
were not the subjects of the care and protection petition in this case.  The mother's long history of engagement with
the department as a parent began in 2005 because of concerns about her
substance misuse when she gave birth to her first child.  The mother subsequently lost custody of her
four older children because of her untreated substance misuse and mental health
problems.  The mother did not have
custody of any of her five children at the time of trial.[3]
      b. 
The father.  The father's long
history of substance misuse began when he was thirteen years old.  He has used alcohol, Percocet, cocaine,
benzodiazepines, fentanyl, heroin, amphetamines, and mushrooms.  In the months immediately after Breck's
birth, the father tested positive for fentanyl and amphetamines.  Approximately two months after the child was
born, the father admitted to using fentanyl every day and amphetamines two to
three times per week.  The father also
has a criminal history dating back to 2009, including a history of selling
heroin, fentanyl, and Adderall.  He was
also the subject of two restraining orders in the past.  At the time of trial, the father was facing
allegations that he had violated the conditions of probation on two of his open
criminal cases.
      c. 
The subject child.  The parents
began dating in 2018 or 2019.  In October
2020, they entered substance misuse treatment together, the mother learned she
was twenty-six weeks pregnant, and her counselor urged her to stop using drugs
for the well-being of the baby.  About
two weeks later, the mother admitted to using fentanyl daily.  Despite the treatment program and the
mother's pregnancy, the parents continued misusing substances together, with
the father often buying drugs for them to use. 
The mother tested positive for fentanyl and other drugs ten times
between November 2020 and two days before Breck's birth.
      In late January 2021, the mother went into
early labor and gave birth to Breck at thirty-six weeks.  At birth, Breck tested positive for fentanyl,
and the mother tested positive for fentanyl and methadone.  A report pursuant to G. L. c. 119,
§ 51A (51A report), was filed alleging neglect and concerns about a
substance-exposed newborn.  The mother
refused to authorize a full release of information held by her substance
dependence disorder treatment provider. 
The parents were homeless, and the father had an active arrest warrant.
      Three days after Breck's birth, a second
51A report was filed alleging concerns about the mother's substance misuse and
the parents' homelessness.  A subsequent
investigation conducted pursuant to G. L. c. 119, § 51B, by the
department supported the neglect allegations. 
The parents developed a safety plan with the department and agreed that
the paternal grandmother (grandmother) would obtain guardianship of Breck.  The parents agreed to the guardianship
arrangement because they believed the department otherwise would take custody
of Breck.  A department social worker
recommended to the grandmother that the parents have only supervised visits
with the child.  In February 2021, a
judge of the Probate and Family Court awarded temporary guardianship of Breck
to the grandmother for ninety days.
      The parents continued to test positive for
fentanyl and amphetamines after Breck's birth. 
The department's concerns about the family escalated on May 10, 2021,
when the department's emergency response workers went to a hotel to investigate
a 51A report alleging neglect of Breck. 
The parents had been renting a room there since February 2021 -- approximately
three months prior to the 51A report -- and hotel personnel had seen the child
alone with the parents during this period. 
The department workers found the mother, apparently asleep, with Breck
lying in the same hotel bed.  The
grandmother was not present.  The mother
admitted to co-sleeping with Breck but claimed that he usually slept in the
bassinet, a claim deemed not credible by the judge and contradicted by the fact
that the bassinet was full of items and appeared to be used as storage.  Breck appeared hungry.  When asked, the mother claimed she last fed
him thirty minutes earlier, even though the workers had been in the hotel room
for an hour and had not seen her feed the child.  The mother and the grandmother gave
conflicting and inconsistent statements about whether Breck was staying alone
with the parents, and the judge found that he had been staying with the parents
for extended periods.  When a department
social worker reminded the grandmother that she had agreed to prohibit
unsupervised visitation with the parents because of the parents' substance
misuse history, the grandmother responded that she did not believe the parents
were using substances.
      The department took emergency custody of
Breck because of concerns about the parents' continued substance misuse and the
grandmother's permitting him to be in the unsupervised care of the
parents.  The department filed the
present care and protection petition pursuant to G. L. c. 119, § 24.  On June 8, 2021, the parents and the child
waived their rights to a temporary custody hearing.
      d. 
Postremoval behavior and events. 
The parents denied continued substance misuse after the department
removed Breck, but the mother tested positive for amphetamines, cocaine, and
fentanyl three days after the removal. 
The father admitted that he was still using illegal substances in May
2021.  The department's social worker
created action plans for the parents that focused on the parents'
sobriety.  The parents disagreed with the
action plans and consistently refused to sign them.  Throughout 2022, the parents tested positive
for drugs, primarily opiates and fentanyl, including at the time of trial.
      The parents' housing instability continued
after Breck's birth, and they reported staying with friends and at hotels to
evade the police because of the father's arrest warrants.
      Breck has been placed with the preadoptive
family since his removal in May 2021 and has made progress since his placement
with them.  He has been diagnosed with
global developmental delays and other medical conditions.  At the time of trial, Breck was receiving
early intervention services and was working with an occupational therapist, a
registered nurse, a speech language pathologist, a physical therapist, and a
developmental specialist.
      In February 2022, the department changed
Breck's permanency goal from reunification to adoption.  The preadoptive parents were willing to
facilitate up to three visits a year with the parents and to provide pictures and
letters.
      On May 2, 2023, following a trial, the
judge found by clear and convincing evidence that both parents were
indefinitely unfit and that terminating their parental rights would serve
Breck's best interests, adjudicated him in need of care and protection, and
committed him to the custody of the department. 
The judge found that the department's plan of adoption by the
preadoptive parents served Breck's best interests, rejecting the competing plan
proposed by the parents, which involved placement with the paternal
grandmother.  Ruling on the mother's
motion, the judge also determined that the department had made reasonable
efforts and denied the father's abuse of discretion motion, in which he had
alleged that the department's updated action plan was arbitrary and capricious
and violated department policy and regulations.[4]
      2. 
Discussion.  a.  Unfitness. 
"In deciding whether to terminate a parent's rights, a judge must
determine whether there is clear and convincing evidence that the parent is
unfit and, if the parent is unfit, whether the child's best interests will be
served by terminating the legal relation between parent and child."  Adoption of Ilona, 459 Mass. 53, 59
(2011).  "We give substantial
deference to a judge's decision that termination of a parent's rights is in the
best interest of the child, and reverse only where the findings of fact are
clearly erroneous or where there is a clear error of law or abuse of
discretion."  Id.  Subsidiary findings must be proven by a fair
preponderance of evidence.  See Adoption
of Quentin, 424 Mass. 882, 886 (1997).
      The judge found the parents to be unfit,
and the parents challenge this finding. 
Even though Breck was only briefly in his parents' care at the time of
his removal, the record is still sufficient to support the judge's conclusion
that he was at risk of neglect and harm because of the parents' ongoing and
long history of substance misuse and untreated mental health issues.  See Care & Protection of Bruce, 44 Mass.
App. Ct. 758, 761 (1998) ("The attention of the judge was concentrated not
on what had occurred between mother and child but on what was predictable.  Although there was nothing to go on in the
way of past abuse or neglect, the judge was not bound to wait for a disaster to
happen if that seemed close to inevitable").  See also Adoption of Querida, 94 Mass. App.
Ct. 771, 775 (2019) (in making fitness determination, proper for judge to
consider parent's past conduct "to predict future ability and performance
as a parent" [citation omitted]).
      When the department removed Breck from the
parents in May 2021, he was placed in his grandmother's temporary guardianship
-- to which the parents had agreed -- that called for them to have supervised
visitation.  The social workers found him
hungry and co-sleeping in a hotel room alone with his parents, in violation of
the safety plan.  Even though Breck was
not physically injured, "[a] judge [does] not have to wait for further
injury to the child[]" before finding a parent unfit and freeing a child
for adoption.  Adoption of Inez, 428
Mass. 717, 721 (1999).  We now address
the factors considered by the judge that led to her finding the parents unfit.
      i. 
Substance misuse.  A substance
misuse disorder, without "a showing that a . . . parent has been
neglectful or abusive in the care of that parent's child," does not
"translate[] automatically into legal unfitness to act as a
parent."  Adoption of Katharine, 42
Mass. App. Ct. 25, 34 (1997).  The
parents, citing Adoption of Katharine, argue that because Breck was not harmed
while in their care, their substance misuse did not place him at risk or
negatively affect their parenting abilities.
      This case is distinguishable from Adoption
of Katharine because the evidence established a nexus between the parents'
substance misuse and a risk of harm to Breck and because, as we discuss below,
the judge did not rely solely on the parents' substance misuse disorders to
support the findings of unfitness.  The
evidence demonstrated that even before Breck's birth, the mother's substance
misuse had contributed to the removal of all four of her older children and had
been a factor in her never having had any of those children in her care over a
long term.  "[A] judge may rely upon
a parent's past conduct with regard to older children to support a finding of
current unfitness as to a different child, so long as that evidence is not the
sole basis for the judge's unfitness determination."  Adoption of Luc, 484 Mass. 139, 145 (2020).  See Adoption of Larry, 434 Mass. 456, 469
(2001) ("The judge could properly consider past parental conduct as
relevant to the issue of current parental fitness where that conduct was not
too remote, especially where the evidence supported the continuing vitality of
such conduct").
      As the judge found, and the mother concedes,
the mother's substance misuse while pregnant with Breck put the child at risk,
as he was born substance exposed, testing positive for fentanyl at birth.  After his birth, the parents continued using
illicit substances, ignoring warnings from the mother's clinician.  See Adoption of Anton, 72 Mass. App. Ct. 667,
676 (2008) (evidence of alcohol or drug misuse is "relevant to a parent's
willingness, competence, and availability to provide care").
      The mother's pattern of substance misuse
continued unabated after Breck's birth, after his removal, and during the
trial.  Despite testing positive for
drugs throughout the pendency of the case, the mother continued to deny her
substance misuse.  She withheld
information and releases from the department, and once the department obtained
her records, the mother claimed that the screens were inaccurate, that the
clinics tampered with them, and that her marijuana was laced with
fentanyl.  At a visit with Breck in
November 2021, the mother smelled like marijuana, and on a different visit, she
appeared to be under the influence.  The
department also had concerns that she was under the influence at a supervised
visit in July 2022.  The judge did not
credit the parents' denials about their substance misuse and found that they
were not truthful with the department about their substance misuse during the
pendency of the case, concluding that they "continued to lack insight into
the harm caused to [Breck] by the removal and their failure to take
accountability for their actions."
      The father's lengthy history of substance
misuse likewise continued unabated throughout the pendency of the case.  He also enabled the mother's substance
misuse, buying her illicit drugs knowing she was pregnant with the child and
using those drugs with her.  His lengthy
criminal record dates to 2009.  Courts
issued numerous warrants for his arrest. 
The parents experienced housing instability while evading the police
because of the father's warrants.  See
Adoption of Anton, 72 Mass. App. Ct. at 676 (inability to secure "adequate
stable housing" properly considered in determining parent's unfitness
[citation omitted]).
      Relying on the parents' decades-long
struggle with substance misuse, the judge's findings established a sufficient
nexus between the parents' substance misuse and their ability to parent
Breck.  See Adoption of Katharine, 42
Mass. App. Ct. at 34.
      ii. 
Mental health.  The mother failed
to seek consistent treatment for her unaddressed mental health conditions.  In June 2021, she was admitted to a partial
hospitalization program for depression and anxiety but was discharged days
later because she did not show up for treatment.  On discharge, she was diagnosed with major
depressive disorder, severe PTSD, and severe opioid use disorder.  She also admitted to using substances to
address her problems.  The record
supports the judge's finding that the parents' untreated mental health issues
caused them to engage in verbally aggressive and combative behavior towards
their social worker and the court investigator. 
Additionally, the parents engaged in a physical altercation at one of
their treatment clinics, which led to their discharge from the program.  The evidence supports the judge's finding
that "[t]he parents' inability to manage their mental health and emotions
makes it unlikely they would be able to support and manage [Breck's] special
needs."
      The parents also failed to comply with
their department service plans relating to mental health and substance misuse
treatment.  The mother relied on
marijuana and unprescribed Adderall to treat her mental health diagnoses, and
the father failed to follow recommendations to meaningfully engage with a
therapist or seek assistance from a psychiatrist.  See Adoption of Luc, 484 Mass. at 147
(parent's unwillingness to adhere to department service plan requiring her to
obtain treatment for mental health challenges and substance misuse disorder
relevant to unfitness determination).
      Relying on the mother's aggressive
behavior and untreated diagnoses of major depressive disorder, severe PTSD, and
severe opioid use disorder, the judge properly concluded that the evidence
established a sufficient nexus between the mother's mental health issues and
the child's neglect and abuse.  See
Adoption of Saul, 60 Mass. App. Ct. 546, 553-554 (2004).
      iii. 
Additional evidence of unfitness. 
The judge also permissibly relied on the parents' failure to engage with
the services on their action plan.  A
"parent's willingness to engage in treatment is an important consideration
in an unfitness determination where the substance dependence inhibits the
parent's ability to provide minimally acceptable care of the child."  Adoption of Luc, 484 Mass. at 147.  Even if a parent engages in some of the
services offered by the department, "mere participation in the services
does not render a parent fit 'without evidence of appreciable improvement in
[the parent's] ability to meet the needs of the child[ren].'"  Adoption of Ulrich, 94 Mass. App. Ct. 668,
677 (2019), quoting Adoption of Terrence, 57 Mass. App. Ct. 832, 835-836
(2003).
      While the judge acknowledged that the
parents engaged in some of the tasks on their action plans, like completing a
parenting class, they failed to participate in many services focused on
addressing their substance misuse and the impact it had on their parenting
capacity.  They failed to (1) allow the
department access to their toxicology screens and treatment records, (2) sign
their action plans, (3) consistently attend Alcoholics Anonymous meetings, (4)
obtain a recovery coach and sponsor, and (5) provide a neuropsychological
evaluation.  They also did not engage
consistently with the department social worker, missing several meetings in
2022, and ceasing meetings in December 2022.
      The parents also displayed a lack of
understanding of Breck's complex medical needs. 
Despite Breck's numerous medical diagnoses and developmental delays, the
parents stated in a July 2022 home study that he had no special needs.  The judge appropriately found that the parents
possessed a "minimal, surface level understanding" of the child's
special needs.
      The evidence in the record amply supported
the judge's findings of parental unfitness, and she did not rely solely on one
factor.  In a thoughtful and detailed
decision, the judge appropriately supported her findings of parental unfitness
with evidence of the parents' lengthy and ongoing fentanyl addiction, their
inability to follow the safety plan to which they had agreed, their failure to
consistently engage in substance misuse and mental health treatment, the
mother's unaddressed mental health conditions, and the parents' lack of
capacity to understand and meet Breck's specialized medical needs.  The judge properly concluded that the
department proved the parents' unfitness by clear and convincing evidence.[5]
      b. 
Best interests of the child.  The
judge did not err in finding that termination of parental rights was in Breck's
best interests.  See Adoption of Ilona,
459 Mass. at 59 ("We give substantial deference to a judge's decision that
termination of a parent's rights is in the best interest of the child, and
reverse only where the findings of fact are clearly erroneous or where there is
a clear error of law or abuse of discretion").  The judge applied the factors set forth in
G. L. c. 210, § 3 (c), and found factors (ii), (iii), (v),
(vi), (viii), and (xii) to be applicable. 
The parents' inability to address their long-standing substance misuse
and mental health issues over a long period of time and the importance of establishing
permanency for the young child, who has resided with the same preadoptive
parents since his removal from the parents and has flourished in their care,
support the judge's finding that termination of the parents' rights is in
Breck's best interests.  See Adoption of
Thea, 78 Mass. App. Ct. 818, 824 (2011), citing Adoption of Nancy, 443 Mass.
512, 517 (2005) ("The Supreme Judicial Court has emphasized the importance
of achieving stability and permanency in children's lives and in decrees
dispensing with parental rights").
      c. 
Reasonable efforts.  The
department is "required to make reasonable efforts to strengthen and
encourage the integrity of the family" before taking action to terminate
parental rights.  Adoption of West, 97
Mass. App. Ct. 238, 241 (2020), quoting Adoption of Lenore, 55 Mass. App. Ct.
275, 278 (2002).  "A judge's
determination that the department made reasonable efforts will not be reversed
unless clearly erroneous."  Adoption
of West, supra at 242.  Alone, a failure
by the department to make reasonable efforts is not dispositive, as a
"judge must still rule in the child's best interest" even if the
department failed to make reasonable efforts. 
Adoption of Ilona, 459 Mass. at 61. 
"[A]t termination proceedings[,] the focus is on the fitness of the
parent to provide parental care and on the child's best interests."  Adoption of Lenore, supra.
      The parents' challenge to the judge's
reasonable efforts finding focuses on the department's purported failure to
refer them to a specific residential treatment program where Breck could have
been placed with them.  "Although
the department is statutorily obliged to make reasonable efforts towards
reunification, 'the means of fulfilling that obligation [are] within the
department's discretion.'"  Care
& Protection of Rashida, 488 Mass. 217, 222 (2021), S.C., 489 Mass. 128
(2022), quoting Care & Protection of Isaac, 419 Mass. 602, 606 (1995).  The department possesses the discretion to
make individual service decisions.  See
Care & Protection of Rashida, supra.
      The parents bear some responsibility for
not receiving the referral they sought. 
The department considered making the referral, but the parents did not
comply with the department's requests for toxicology screens needed to assess
the parents' eligibility for the program.[6] 
See Adoption of Daisy, 77 Mass. App. Ct. 768, 782 (2010), S.C., 460
Mass. 72 (2011) (department required to make reasonable efforts to strengthen
family but obligation to work with parent was contingent upon parent's
obligation to fulfill parental responsibilities).  The judge's finding that the department made
reasonable efforts was not clearly erroneous.
      d. 
The permanency plan.  The mother
contends that the judge abused her discretion by concluding that it was in
Breck's best interests to approve the department's goal of adoption by the
preadoptive parents rather than approving the parents' proposed plan of
placement with the grandmother.  We
disagree. 
      "Where the department files a
petition to dispense with a parent's consent to adoption, it must 'concurrently
identify, recruit, process and approve a qualified family for adoption.'"
Adoption of
Willow, 433 Mass. 636, 652 (2001), quoting G. L. c. 210 § 3
(b).  The judge must also "consider
parental nominations of caretakers and then determine which placement will
serve the best interests of the child." 
Adoption of Dora, 52 Mass. App. Ct. 472, 474-475 (2001).  "In cases where the parents have offered
a competing plan, the judge must assess the alternatives and, if both pass
muster, choose which plan is in the child's best interests, however difficult
that choice may be."  Id. at
475.  We review the judge's decision for
abuse of discretion.  See Adoption of
Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P.,
526 U.S. 1034 (1999).
      After obtaining temporary guardianship of
Breck in February 2021, the grandmother allowed the parents unsupervised
contact and told the department she did not believe that they were using
substances.[7]  She told a social worker
she believed that the parents were "sober, suitable and that [Breck]
should be in their care."  The
record supports the judge's findings that, while the grandmother loves Breck,
her lack of insight regarding the parents' substance misuse disorder
"negatively impacts her ability to meet [the] child's needs and provide
the safe and stable home that he requires, which is of significant
concern," and that she "is neither capable or willing to maintain
safe boundaries with the parents to protect [Breck] from future abuse and
neglect."
      Further, the grandmother did not have
adequate housing for Breck.  She lived
with her brothers, slept on a couch, and did not have her own bed.  A social worker hired by the father visited
the grandmother's home and concluded that it was not an appropriate long-term
placement for Breck due to inadequate space.
      The grandmother saw Breck only five times
after his removal in May 2021, did not know about his specialized medical
needs, stated that she would rather have someone with her when visiting Breck
than be alone with him, and testified that she would rely on the parents if she
needed anything, revealing her lack of understanding and her inability to set
boundaries with the parents that the judge appropriately considered.
      In contrast, Breck appeared happy in the
preadoptive parents' home, where he has his own bedroom.  Breck had significant developmental delays
when he was initially removed from the parents' care, but he has made significant
progress since living with the preadoptive parents, who have provided for all
his needs and have ensured that he receives services to address his specialized
needs.  The judge appropriately found
that the preadoptive parents "have been vigilant and responsive
caretakers" for him.
      The judge's extensive fact finding
regarding the viability of placement with the grandmother illustrates the
"meaningful evaluation" required when the parents offer a competing
adoption plan.  Adoption of Dora, 52
Mass. App. Ct. at 476.  There was no abuse
of discretion.
      e. 
Posttermination and postadoption visitation.  An order for posttermination and postadoption
visits is "grounded in the over-all best interests of the child, based on
emotional bonding and other circumstances of the actual personal relationship
of the child and the biological parent, not in the rights of the biological
parent nor the legal consequences of their natural relation."  Adoption of Vito, 431 Mass. 550, 562 (2000).  After finding parental unfitness, a judge
"has broad discretion to determine what is in a child's best interests
with respect to custody and visitation with biological family members
thereafter."  Adoption of Ursa, 103
Mass. App. Ct. 558, 571 (2023), quoting Adoption of Rico, 453 Mass. 749, 756
(2009).  In deciding whether to order
visitation, a judge should consider whether the child has "a significant,
existing bond with the biological parent[s]" whose rights have been
terminated.  Adoption of Ilona, 459 Mass.
at 63-64, quoting Adoption of Vito, supra at 563.
      After finding the parents unfit and
terminating their parental rights, the judge concluded that the evidence did
not establish that a visitation order was required to serve the child's best
interests.  She declined to order
posttermination or postadoption visitation between the parents and Breck and
left posttermination visits to the department's discretion and postadoption
visits to the preadoptive parents' discretion. 
In doing so, the judge concluded that the evidence failed to demonstrate
that Breck had "developed a strong attachment or bond" with either
parent despite having weekly visits.  She
also considered other factors such as the preadoptive family's willingness to
facilitate contact with the biological parents, the child's age, and
"anticipated changes in [Breck]'s future needs" in deciding that any
postadoption contact should be left to the discretion of the adoptive parents,
as they would "be in the best position to determine the best interests of
the child's future needs as he grows." 
See Adoption of Ilona, 459 Mass. at 66. 
The judge acted within her discretion in declining to order visitation.
      f. 
The ICWA.  The parents assert for
the first time on appeal[8] that the judge erred in finding that the ICWA did
not apply to the case.  "The ICWA,
when applicable, triggers a heightened evidentiary standard and burden of proof
for termination of parental rights." 
Adoption of Ursa, 103 Mass. App. Ct. at 564.  See Haaland v. Brackeen, 599 U.S. 255, 281
(2023).  "A child subject to
adoption or parental termination proceedings may qualify as an 'Indian child'
under 25 U.S.C. § 1903(4) by being 'a member of an Indian tribe'
. . . or being both 'eligible for membership in an Indian tribe and
. . . the biological child of a member of an Indian
tribe.'"  Adoption of Ursa, supra,
quoting 25 U.S.C. § 1903(4).
      The judge must affirmatively inquire
whether the child is an Indian child. 
See Adoption of Ursa, 103 Mass. App. Ct. at 565, citing 81 Fed. Reg.
38,778, 38,805 (June 14, 2016).  "The
inquiry should be made 'at the commencement of the proceeding and all responses
should be on the record.'"  Adoption
of Ursa, supra, quoting 25 C.F.R. § 23.107(a) (2016).  "[W]here the court knows or has reason
to know that an Indian child is involved, the party seeking the foster
placement of, or termination of parental rights to, an Indian child shall
notify the parent or Indian custodian and the Indian child's tribe
. . . of the pending proceedings and their right of
intervention."  Adoption of Ursa,
supra, quoting 25 U.S.C. § 1912(a).
      Here, the judge made the appropriate ICWA
inquiry at the outset of the case.  The
father claimed to be a member of the Sault Ste. Marie Tribe of Chippewa
Indians.  The grandmother's mother and
brothers were registered members of the tribe, but at the time of trial, the
grandmother was not a registered member. 
The department sent the proper notice, pursuant to 25 U.S.C.
§ 1912(a), by registered mail to the Bureau of Indian Affairs on May 21,
2021.  In September 2021, the department
filed proof of notice to the tribe with the court.  In letters to the department's ICWA
coordinator dated June 20, 2022, the tribe confirmed that the father and the
child were neither members nor eligible to enroll.  The father was not a registered member of the
tribe at the time of trial, and the judge accordingly found that the ICWA did
not apply.
      The parents contend that the decrees
should be vacated because Breck is now enrolled in the tribe.[9]  They argue that notice should (again) be
given to the tribe and that the heightened substantive statutory requirements
of the ICWA should apply.  We find the
argument unavailing.  At the time of
trial, the father and the child were not members of the tribe and were
ineligible to enroll, and thus the child did not meet the ICWA definition of an
"Indian child."  25 U.S.C.
§ 1903(4) (defining "Indian child" as unmarried person under age
eighteen who "is either [a] a member of an Indian tribe or [b] is
eligible for membership in an Indian tribe and is the biological child of a
member of an Indian tribe").  See
Haaland, 599 U.S. at 265.  "A tribal
determination of a child's eligibility for tribal membership is conclusive as a
matter of law."  Adoption of Ursa,
103 Mass. App. Ct. at 567.  Because at
the time of trial, neither the child nor the father was enrolled in a tribe
recognized under the ICWA, the judge correctly found that the ICWA did not
apply.  See Nielson v. Ketchum, 640 F.3d
1117, 1123-1124 (10th Cir. 2011), cert. denied, 566 U.S. 1009 (2012).  See also Matter of M.H.C., 381 P.3d 710, 714
(Okla. 2016) (ICWA became applicable when mother gained tribal membership, but
did not retroactively apply to invalidate prior court orders).  Thus, the parents have not demonstrated that
they are entitled to the invalidation of the decrees based on a violation of
the ICWA.  See Matter of Johanson, 156
Mich. App. 608, 613-614 (1986) (no abuse of discretion in denial of mother's
motion for rehearing when she and child became registered tribe members after
order terminating her parental rights).
      3. 
Conclusion.  We affirm the decrees
adjudicating the parents unfit and terminating their parental rights to the
child and affirm the single justice's denial of the parents' joint motion for a
stay of their appeals.
So ordered. 

footnotes

[1] A pseudonym.

[2] The parents
filed a joint motion to stay their appeals and for leave to file a motion for a
new trial in the trial court pursuant to Mass. R. Civ. P.
60 (b), 365 Mass. 828 (1974), on the ground that ICWA was violated.  A single justice of this court denied the
motion, concluding that the parents failed to demonstrate that the motion for a
new trial has "a sufficiently strong likelihood of success on the merits
to justify the resulting delay in completion of appellate review."  Adoption of Ulrich, 94 Mass. App. Ct. 668,
675 (2019).  The parents each appealed
the single justice's order, and those appeals were consolidated with their
underlying appeals of the decrees, but the parents did not raise any separate
argument with respect to the order in their briefs or at oral argument.  Accordingly, we need not address the
propriety of the order.  See Abate v.
Fremont Inv. & Loan, 470 Mass. 821, 833 (2015) (challenge to ruling waived
where appellant failed to make any argument about it on appeal).

[3] The father is
the biological father of only Breck.

[4] The motions
were heard together with the trial by agreement of the parties.

[5] The father
also argues that the judge erred in admitting out-of-court statements of his
nephew alleging sexual abuse by the father and considering the statements in
her decision finding him unfit.  Because
the father did not object to the evidence at trial, the argument is
waived.  See Adoption of Kimberly, 414
Mass. 526, 534-535 (1993).

[6] Because the
parents could not enter the program if they were in a state of detoxification
or at risk of withdrawal, these screens were necessary.

[7] The parents
argue that the judge erred by finding that the paternal grandmother did not
have authority, as Breck's temporary guardian, to allow the parents to care for
him, and that the erroneous finding contributed to the judge's decision.  Even if the finding was erroneous, we
consider it harmless, considering the overwhelming evidence supporting the
judge's ultimate conclusion of unfitness. 
See Adoption of Peggy, 436 Mass. 690, 702, cert. denied sub nom. S.T. v.
Massachusetts Dep't of Social Servs., 537 U.S. 1020 (2002).  In any event, the judge could have reasonably
determined that the paternal grandmother's decision to leave Breck in the
parents' unsupervised care was a severe lapse of judgment demonstrating the
paternal grandmother's unsuitability as a guardian.

[8] The parents
sought a stay of this appeal to enable them to file a motion for a new trial
raising the ICWA issue.  A single justice
denied the motion.  See note 2,
supra.  Assuming without deciding that
the issue may be raised at any time under 25 U.S.C. § 1914, and because
the issue has been fully briefed, we exercise our discretion to address it.

[9] In his brief,
the child argues that the father lacked the authority to enroll Breck in the
tribe after the termination of his parental rights.  The question is not addressed by the other
parties, and we decline to address the issue as the determination of that
question would not affect the outcome in the case.